**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 06-3

———————

PHILIP EDWARD WILKINSON,

                                        Petitioner - Appellant,

        versus

MARVIN L. POLK, Warden, Central Prison,
Raleigh, North Carolina,

                                        Respondent - Appellee.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  Malcolm J. Howard, Senior
District Judge.  (5:01-hc-00343-H)

———————

Argued:  November 29, 2006              Decided:  April 5, 2007

———————

Before WILKINS, Chief Judge, and TRAXLER and GREGORY, Circuit
Judges.

———————

Affirmed by unpublished opinion.  Chief Judge Wilkins wrote the
opinion, in which Judge Traxler and Judge Gregory joined.

———————

**ARGUED:** Erwin Chemerinsky, Professor, DUKE UNIVERSITY SCHOOL OF
LAW, Durham, North Carolina, for Appellant.  Sandra Wallace-Smith,
Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE,
Raleigh, North Carolina, for Appellee.  **ON BRIEF**: Mary Ann Tally,
CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina;
Matt C. Stiegler, Durham, North Carolina, for Appellant.  Roy
Cooper, Attorney General, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

WILKINS, Chief Judge:

Philip Edward Wilkinson appeals an order of the district court denying his petition for a writ of habeas corpus, see 28 U.S.C.A. § 2254 (West 2006), in which he challenged his convictions and death sentences for the murders of Judy, Chrystal, and Larry Hudson.[1] Wilkinson contends that law enforcement officers unconstitutionally interfered with his relationship with trial counsel, that the prosecution failed to turn over materially exculpatory evidence, and that his counsel were constitutionally defective in several respects. Because we conclude that the first of these claims is defaulted and that the rejection of the remainder by the state court was neither contrary to, nor an unreasonable application of, clearly established federal law, we affirm.

I.

Judy, her 19-year-old daughter Chrystal, and her 11-year-old son Larry were found dead in their apartment in Fayetteville, North Carolina, on July 30, 1991. All three had been bludgeoned to death; Judy and Chrystal had been sexually assaulted. Police were at a standstill in the investigation until January 9, 1992, when Wilkinson turned himself in and confessed to the crime.

---

[1]Wilkinson named Marvin Polk, Warden of Central Prison in Raleigh, North Carolina, as Respondent. We will refer to Respondent as "the State."

2

Wilkinson provided the following account of the murders to law enforcement officers. On the night of July 29, 1991, Wilkinson--a habitual Peeping Tom--met a female friend at a restaurant at approximately 9:00 p.m. Wilkinson drank heavily before, during, and after this meeting. When Wilkinson's friend left the bar, he followed her in his vehicle. He was angry because she had been "teasing" and "flirtatious," and he intended to go to her apartment to seduce her or, "if it did lead to that," to rape her. Id. at 609. Wilkinson deliberately parked some distance from the apartment in order to avoid detection. He abandoned his plan when the woman's dog began barking at him.

On his way back to his barracks,[2] Wilkinson pulled into the Heather Ridge Apartment complex, where the Hudsons lived. Walking around the back of the complex, he approached the sliding glass doors at the back of the Hudsons' apartment and observed Chrystal on the couch in a t-shirt and panties, asleep. Looking at her, Wilkinson "was getting all worked up ... [b]ecause I had already planned on doing that other chick." Id. at 611. He picked up a bowling pin that he saw outside the apartment door and "knew," at that point, that he "was going to kill her." Id. at 640.

Wilkinson entered the apartment and fondled Chrystal, who woke up. Wilkinson clubbed Chrystal repeatedly with the bowling pin,

---

[2]At the time of the murders, Wilkinson was a soldier stationed at Fort Bragg.

killing her. He then bit her breasts and attempted to rape her, but failed because he was unable to achieve an erection. It then occurred to Wilkinson that there might be other people in the apartment. He found Judy and Larry asleep in one of the bedrooms. He retrieved the bowling pin from the living room and bludgeoned both of them to death. He then used a lightbulb to sexually assault Judy and Chrystal.

Wilkinson eventually left the apartment, but upon reaching his car he realized that he had left behind the bowling pin and the lightbulb. He went back to the apartment to get these things, and while there attempted to eliminate evidence of his presence in the apartment by wiping down the screen door and the faucet where he had washed his hands.

Police were without leads in the murders until approximately six months later, when Wilkinson turned himself in and confessed. He eventually pleaded guilty to three counts of first-degree murder and other offenses. Thereafter, a jury sentenced him to death on each of the murder convictions. The convictions and sentences were affirmed on direct appeal. See State v. Wilkinson, 474 S.E.2d 375 (N.C. 1996). In 1997, Wilkinson filed a motion for appropriate relief (MAR). The MAR court denied relief on the pleadings, and the North Carolina Supreme Court denied Wilkinson's petition for a writ of certiorari. See State v. Wilkinson, 546 S.E.2d 394 (N.C. 2000).

In May 2001, Wilkinson filed this petition for a writ of habeas corpus in the district court. As is relevant here, Wilkinson raised three claims:

1.  Law enforcement officers, acting as agents of the state, violated Wilkinson's constitutional right to counsel by making disparaging remarks about counsel and encouraging Wilkinson to reject counsel's advice.

2.  The State failed to disclose material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

3.  Trial counsel were ineffective in their preparation and presentation of Wilkinson's case in mitigation.

The district court concluded that the first claim was procedurally defaulted and that all of the claims were without merit. Having received a certificate of appealability from the district court, Wilkinson now appeals.

II.

To the extent that Wilkinson's claims were reviewed on the merits in state court proceedings, our review is constrained by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. Pursuant to that act, we review the decision of the district court de novo, but we defer to the decision of the state court insofar as it adjudicated Wilkinson's claims. See Conaway v. Polk, 453 F.3d 567, 581 (4th Cir. 2006). A federal court may grant habeas relief on a claim "adjudicated on the merits" by a state court only if the state court ruling "resulted in a decision that was contrary to, or

5

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d).

> A decision is "contrary to" clearly established federal law if it either applies a legal rule that contradicts prior Supreme Court holdings or reaches a conclusion different from that of the Supreme Court "on a set of materially indistinguishable facts." A decision is an "unreasonable application" of clearly established federal law if it "unreasonably applies" a Supreme Court precedent to the facts of the petitioner's claim.

Buckner v. Polk, 453 F.3d 195, 198 (4th Cir. 2006) (quoting Williams v. Taylor, 529 U.S. 362, 412-13 (2000)) (citation omitted), petition for cert. filed, No. 06-8699 (U.S. Jan. 3, 2007).

With these principles in mind, we turn to an examination of Wilkinson's claims.

III.

During Wilkinson's initial contact with police, the following exchange occurred between Wilkinson, Sergeant Mike Calfee, and Investigator Jeff Stafford:

P. Wilkinson:   I want a quick or a speedy trial.... How long do you think [it's] going to be before the trial.

Sgt. Calfee:    That's up to you.

Inv. Stafford:  The quickest that this would get done would be six months.

6

P. Wilkinson:   I have to stay in Fayetteville for six months.

Sgt. Calfee:   Maybe four months if [you're] real adamant[. W]hat will happen to you, is you will get an appointed public defender .... <u>And with all public defenders they are going to want you to plead not guilty. And try to make up some kind of a story, as to why it couldn't be used</u>.

P. Wilkinson:   What I am [sic] here telling you guys everything.

Sgt. Calfee:   You have to be adamant with your public defender, about what you want to do, <u>because they are going to tell you what they are going to do. They are good for that, for not listening to what you want to do</u>. What you want to do is what I would want to do, if I was in your position.... [G]et it over with, get my sentence started, and go on with the rest of my life....

P. Wilkinson:   This is taxpayer[s'] money, and I really don't think that's fair, that they have to pay for what I did.

Sgt. Calfee:   That will be between you and your public defender.

P. Wilkinson:   What if I didn't have one?

Sgt. Calfee:   You have to have one. This is a [capital] case. You have to be represented by a competent counselor. <u>[It's] up to you, your public defender[] will say we want you to [plead] not guilty and come up with some excuse. That's where you come in and say look no, that's not what I want you to do</u>, you are here to represent me, and this is the way I want to proceed.

J.A. 655-56 (emphasis added).

7

A public defender was appointed to represent Wilkinson on January 10, and she instructed Wilkinson not to talk with anyone, especially Calfee and Stafford. Nevertheless, the officers contacted Wilkinson on January 16 and spoke to him without his attorney's knowledge. The notes of this interview state that Wilkinson "told us that he thought[] that he made his attorney mad, because she wanted him to sign a paper, telling him not to talk to us [any] more. And he refused to sign this paper. We told him that [s]he was only looking out for him." J.A. 422 (emphasis added). The report further states that the officers advised Wilkinson of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). The report continues: "He initialed and indicated that he understood, and that he did not want to talk to us, and that he would talk to us, without an attorney being present." J.A. 422. The officers contacted Wilkinson once more on February 14, again without the knowledge of his attorney.

Wilkinson maintains that these contacts, particularly the first one, violated his Sixth Amendment rights because the officers disparaged his attorneys and thus interfered with his relationship with them. The MAR court found that this claim was procedurally defaulted because Wilkinson could have raised it on direct appeal. The district court affirmed this finding and also determined that the claim was without merit. We affirm on the basis that the claim was procedurally defaulted.

8

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). The procedural rule at issue here is N.C. Gen. Stat. § 15A-1419(a)(3) (2005), which provides that a claim is defaulted if the petitioner could have raised it in a previous appeal but failed to do so. The MAR court determined that the facts underlying Wilkinson's Sixth Amendment claim were presented on the face of the trial record, and thus the claim could have been raised on direct appeal, see State v. Fair, 557 S.E.2d 500, 525 (N.C. 2001) (holding that an ineffective assistance of counsel claim must be raised on direct appeal when the facts supporting the claim are presented on the face of the record).

Wilkinson does not dispute the general adequacy of § 15A-1419(a)(3). Rather, he maintains that counsel could not have raised the issue at trial or on direct appeal because the fact and content of Wilkinson's conversations with Calfee and Stafford were known only to Wilkinson. This is an incorrect statement of the record. As the district court noted, "a videotape of Wilkinson's conversation with the officers was admitted into evidence" during the penalty phase, and "Sergeant Stafford testified that he met with Wilkinson on two other occasions at the jail." J.A. 698-99.

9

We therefore affirm the conclusion of the district court that this claim is procedurally defaulted.

## IV.

Wilkinson next maintains that the State failed to disclose material exculpatory evidence--namely, the results of a blood alcohol test--in violation of <u>Brady</u>. The MAR court ruled that this claim was procedurally defaulted and that, alternatively, it was without merit. On federal habeas review, the district court concluded that the claim was not defaulted but that the merits ruling of the MAR court was not an unreasonable application of clearly established law. The State does not challenge the rejection by the district court of the procedural default ruling by the MAR court, and we therefore do not consider it. We conclude, rather, that the rejection of this claim on the merits by the MAR court is entitled to deference under the AEDPA.

By his own account, Wilkinson drank heavily on the night of the murders. By 8:00 p.m., he had drunk eight beers. He then met his friend at the bar, where he drank another six to eight mixed drinks, each one a double. After leaving the bar, Wilkinson drank another two beers in his car before he committed the murders. Indeed, Wilkinson told the police during his confession that he was drunk at the time of the murders and had difficulty recalling some of the details of the crimes.

Wilkinson missed his 6:00 a.m. formation on the morning following the murders. His squad leader found him and had him taken to the hospital, where a blood alcohol test was conducted. Defense counsel repeatedly requested a copy of the test results but did not receive them until two days after Wilkinson pleaded guilty. Based on the test results, a toxicologist hired by MAR counsel estimated that Wilkinson had a blood alcohol level of .174 at the time of the murders.

Wilkinson argues that the failure to provide the test results prior to his guilty plea constituted a violation of his due process rights. Suppression by the government of evidence favorable to the defense that is material to the outcome of a trial or sentencing proceeding violates due process, irrespective of the good or bad faith of the prosecutor. See Brady, 373 U.S. at 87. Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted); see id. at 436 (explaining that "suppressed evidence [must be] considered collectively, not item by item"). A "reasonable probability" is one sufficient to undermine confidence in the outcome. See id. at 434.

Wilkinson contends that the test results were material because they would have enabled trial counsel to persuade Wilkinson that he

11

was too drunk to premeditate the murders, and thus that he should plead guilty to second-degree murder or plead not guilty and try to persuade a jury, based on a defense of voluntary intoxication, that he was innocent of capital murder. This claim fails. Even without the test results, Wilkinson's attorneys had ample evidence to support a jury instruction on voluntary intoxication. See State v. Mash, 372 S.E.2d 532, 538 (N.C. 1988). Wilkinson's attorneys knew that Wilkinson had been drinking heavily for hours before the incident and that he had stated in his confession that he was drunk at the time of the murders--even that he did not think he would have killed the victims had he been sober. Additionally, counsel knew that Wilkinson's sobriety was sufficiently questionable the next day that his commanding officer had him taken in for a blood alcohol test. In short, even without the test results, Wilkinson's attorneys had ample evidence to support a voluntary intoxication defense and to persuade their client to seek a lesser conviction, whether through plea or trial. It is exceedingly unlikely that having the actual test results would have made any difference to the outcome. We therefore conclude that the rejection of this claim by the MAR court was neither contrary to, nor an unreasonable application of, clearly established federal law.

V.

Finally, Wilkinson challenges the effectiveness of trial counsel. In order to establish that his constitutional right to the effective assistance of counsel was violated, Wilkinson must make a twofold showing. See Wiggins v. Smith, 539 U.S. 510, 521 (2003). First, he must demonstrate that his attorneys' "representation fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight ... and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. at 689.

Wilkinson must also demonstrate that he was prejudiced by his attorneys' ineffectiveness, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the context of an ineffective assistance claim related to counsel's performance during the penalty phase of a capital trial, the question is whether the habeas petitioner can demonstrate a reasonable probability that at least one juror would have voted to impose a sentence of life imprisonment. See Buckner, 453 F.3d at 203.

13

A.

Wilkinson maintains that trial counsel failed to make an adequate presentation regarding the statutory mitigating factor that "the defendant was under the influence of mental or emotional disturbance." N.C. Gen. Stat. § 15A-2000(f)(2) (2005). In particular, Wilkinson criticizes trial counsel's failure to make use of Dr. Billy Royal and Dr. Faye Sultan, both of whom were defense experts who had examined Wilkinson. Instead, trial counsel presented the testimony of Dr. Stephen Alexander, who testified at length regarding Wilkinson's mental state around the time of the murders.

Trial counsel adequately explained their failure to use Royal and Sultan. As to Royal, trial counsel abandoned him as an expert after he failed to produce an intelligible report after two years on the case. As the district court explained,

> Despite having worked on [Wilkinson's] case for two years and having cost the defense over $7,000 in court-authorized funds, Dr. Royal never completed his evaluation and never reached any final conclusions regarding [Wilkinson's] state of mind. Counsel told the trial judge that they were finally able to "pry an evaluation out of [Dr. Royal]" approximately eight or nine months before [Wilkinson's] trial but that the evaluation was "worthless" and "gibberish." Trial counsel effectively had two choices -- they could continue working with Dr. Royal and hope that he would provide something useful or they could cut their losses and begin anew with different experts. Given the circumstances trial counsel faced, it cannot be said that they performed deficiently in choosing different mental health experts to assist them.

14

J.A. 725 (third alteration in original). Dr. Sultan, after examining Wilkinson, adamantly refused to have any further involvement in the case, saying that her testimony would hurt Wilkinson more than help him.

In light of these circumstances, it was not ineffective for counsel to employ different experts to present Wilkinson's case in mitigation. Indeed, this is precisely the type of strategic judgment that is entitled to a full measure of deference from reviewing courts. See Strickland, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Moreover, the experts employed by counsel, particularly Dr. Alexander, who testified as to Wilkinson's mental state, were very effective. The jury found the "mental or emotional disturbance" mitigator based on Dr. Alexander's testimony. Therefore, it was not unreasonable or contrary to Strickland for the MAR court to reject this claim.

B.

Trial counsel presented substantial evidence regarding the circumstances of Wilkinson's upbringing. This testimony was presented through Wilkinson's younger brother and sister, Paul and Jennifer, and through psychotherapist Janet Vogelsang. These three witnesses testified that Wilkinson's parents divorced when he was six and that his father visited the family on Sundays for a while, but then dropped out of their lives. They also testified that

15

despite living in a middle-class neighborhood in Ohio, they were sometimes without electricity and hot water because Wilkinson's mother, a nurse, refused to work to support the family. On occasion, Wilkinson's mother would parade her children (including Wilkinson's older brother, Peter, who is developmentally disabled) in front of various churches, begging for charity. They would move on to another church when one grew tired of supporting them. All of the churches were fundamentalist Pentecostal, and Wilkinson grew up fearing that if he took one wrong step, he would go to Hell. Also, the Wilkinson home was chaotic and filthy, and the children could not bring their friends over. Their mother was often absent when the children were home; once, Jennifer was injured by a piece of falling plaster, and the children had to go to a neighbor for help because they could not find their mother. In addition to laying out this factual background, Dr. Vogelsang testified at length regarding the impact of Wilkinson's upbringing on his mental health, specifically relating the circumstances to his behavior in the murders.

Despite all of this, Wilkinson maintains that trial counsel were ineffective for not presenting more witnesses, particularly Wilkinson's parents. Indeed, Wilkinson criticizes the fact that his parents were told there were no funds to bring them to North Carolina for the trial. Wilkinson maintains that additional witnesses would have allowed trial counsel to "develop[] a far more

detailed and richer description of Mr. Wilkinson's childhood." Br. of Appellant at 49.

The rejection of this assertion by the MAR court was not unreasonable. The picture presented to the jury, particularly through the testimony of Wilkinson's siblings, was quite detailed. It is highly unlikely that additional evidence, which would merely have been cumulative, would have changed the outcome. We therefore affirm the denial of habeas relief on this claim.

C.

Wilkinson's strongest claim regarding the effectiveness of trial counsel concerns their failure to present evidence that Wilkinson was filled with remorse for the murders. Specifically, Wilkinson maintains that trial counsel should have presented testimony from Randy Johnson, a pastor who spoke with Wilkinson shortly before Wilkinson confessed to the murders. In an affidavit submitted with Wilkinson's MAR, Pastor Johnson stated that he "could sense that [Wilkinson] was extremely remorseful." J.A. 466. Pastor Johnson further affirmed that he thought Wilkinson was a very likeable young man and that he would have been willing to testify if he had been subpoenaed. Although Wilkinson's acceptance of responsibility for his criminal conduct was submitted as a mitigating factor, it was not found by any juror.

The failure to call Pastor Johnson as a witnesses is troubling, particularly since it appears that no other witness

17

testified at length regarding Wilkinson's remorse for the crimes, and counsel did not spend any significant time arguing that Wilkinson was remorseful, instead focusing on the fact that the investigation of the murder was at a dead end and that Wilkinson did the right thing by turning himself in.  However, we do not consider this claim on de novo review, but rather subject to the strictures of the AEDPA.  Pursuant to those limitations, that we would decide an issue differently on de novo review is not enough to grant habeas relief; the decision of the state court must not be merely incorrect, but unreasonable.  See Lovitt v. True, 403 F.3d 171, 178 (4th Cir.), cert. denied, 126 S. Ct. 400 (2005).

We cannot reach such a conclusion here.  Assuming that trial counsel were ineffective for failing to present Pastor Johnson's testimony, it was not unreasonable for the MAR court to conclude that there was no resulting prejudice.  In the first place, Wilkinson's confession revealed that he had talked to Pastor Johnson for the very first time only a few hours, at most, before his confession.  And, as the district court noted, not only did Dr. Alexander testify regarding Wilkinson's remorse, but trial counsel made it clear to the jury that the crime would have gone unsolved had Wilkinson not voluntarily confessed.  Finally, the jury knew that Wilkinson had pleaded guilty and that he had insisted upon doing so from the moment he turned himself in.  In light of the evidence presented of Wilkinson's remorse, we cannot

18

say that it was <u>unreasonable</u> for the MAR court to conclude that the failure to present the additional testimony of Pastor Johnson would not have created a reasonable probability of a different outcome. We therefore affirm the denial of relief on this claim.[3]

## VI.

For the reasons set forth above, we affirm the denial of habeas relief by the district court.

<u>AFFIRMED</u>

---

[3]Wilkinson also argues that trial counsel should have presented evidence regarding his ability to adjust to a prison environment. This claim is without merit. Given the evidence before the jury (both in aggravation and mitigation), it is highly unlikely that the jury would have been swayed to impose a life sentence based on the fact that Wilkinson would have been a good prisoner, especially considering that the state did not argue future dangerousness as an aggravating factor. It therefore was not unreasonable for the MAR court to reject this assertion.